UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GEICO MARINE INSURANCE COMPANY
f/k/a SEAWORTHY INSURANCE COMPANY,

                       **Plaintiff,**

- against -

**GREAT NORTHERN INSURANCE COMPANY,**

                       **Defendant.**

**REPORT AND RECOMMENDATION**

**16-CV-1788 (GHW) (RLE)**

**TO THE HONORABLE GREGORY H. WOODS, U.S.D.J.:**

## I. INTRODUCTION

On March 9, 2016, Plaintiff GEICO Marine Insurance Company f/k/a Seaworthy Insurance Company ("GEICO") filed this action against Great Northern Insurance Company ("GNIC") for declaratory relief, alleging an obligation to indemnify GEICO for defense costs and expenses, as well as the settlement amount paid, for the underlying personal injury action in this District. (Doc. No. 1.) On October 7, 2016, GEICO and GNIC each filed motions for summary judgment. (Doc. Nos. 24, 32.) On November 4, 2016, each filed opposition papers to the other's motion. (Doc. Nos. 44, 40.)

For the reasons set forth below, I recommend that the Court **DENY** each Party's motion for summary judgment.

## II. BACKGROUND

Defendant Great Northern Insurance Company issued a "Masterpiece Policy" to Carl Schlanger in April 2013. (Doc. No. 35-1.) GNIC's policy provided various types of coverage to Schlanger, including liability coverage of $1 million, for the period of April 1, 2013, to April 1,

2014. (*Id.* at 10-11.) On August 24, 2013, Schlanger was involved in an incident while operating a personal watercraft ("PWC" or "jet ski"), causing Peter Weiss to sustain injuries. (Doc. No. 31 at 2.) This incident was the basis for the underlying action *Peter Weiss v. Carl Schlanger*, 14-cv-06452 (RLE) (2014) ("*Weiss* case"). (*Id.*) GEICO provided insurance coverage for the PWC under its "Personal Watercraft Policy." (Doc. No. 36 at 2.) This policy insured the PWC from May 20, 2013, to May 20, 2014, providing liability coverage of $300,000 per accident. (*Id.*) GNIC and GEICO acknowledged their responsibility to defend and indemnify Schlanger for costs, fees, and liability resulting from the *Weiss* case. (Doc. No. 31 at 2.) GEICO defended Schlanger up to the settlement of the *Weiss* case on March 16, 2016, for $490,000. (*Id.* at 3.) The total costs to defend Schlanger remains disputed, with GEICO claiming costs of $71,921.32, (*Id.*), and GNIC claiming defense costs to be $69,342.16, (Doc. No. 36 at 9.) GNIC paid fifty percent of the settlement amount, $245,000, and $34,671.08 toward defense costs and expenses. (Doc. No. 36 at 9.) GEICO alleges that GNIC must reimburse 100% of the settlement and defense costs, because of GEICO's interpretation of both insurers' policies and their respective "other insurance" clauses.[1,2] (Doc. 31 at 3.) GNIC's "other insurance" clauses provide:

> Vehicles and Uninsured/Underinsured Motorists: When liability insurance applies to covered damages, we will pay our share. Our share is the proportion that the amount of

---

[1] "Other insurance" clauses, and their types, are briefly summarized here:
An "other insurance" clause "limit[s] an insurer's liability where other insurance may cover the same loss" (15 Couch on Insurance 3d § 219:1). This may be accomplished by providing that the insurance provided by the policy is excess to the insurance provided by other policies, in which case the "other insurance" clause is known as an excess clause (15 Couch on Insurance 3d § 219:33; 22 Holmes' Appleman on Insurance 2d § 140.2 [B] [1]). Alternatively, an "other insurance" clause may limit the insurer's liability by providing that, if other insurance is available, all insurers will be responsible for a stated portion of the loss; an "other insurance" clause of this kind is known as a pro rata clause (15 Couch on Insurance 3d § 219:27-219:28; 22 Holmes' Appleman on Insurance 2d § 140.2 [A]).
*Sport Rock Int'l, Inc. v. Am. Cas. Co. of Reading, PA*, 65 A.D.3d 12, 18 (2009).
[2] "Where the same risk is covered by two or more policies, each of which was sold to provide the same level of coverage, [allocation of coverage] among the policies is determined by comparison of their respective 'other insurance' clauses." (*Id.*)

2

coverage under this policy bears to the total of all applicable amounts of coverage. However, for non-owned motorized land vehicles, this insurance is excess over any other insurance, except that written specifically to cover excess over the amount of coverage in this policy.

Personal and Excess: This insurance is excess over any other insurance except that written specifically to cover excess over the amount of coverage that applies in this policy.

(Doc. No. 35-3 at 19.) GEICO's "other insurance" clause ("GEICO Clause") provides:

If there is any other available insurance that would apply in the absence of this policy, this insurance shall apply as excess over the other insurance, but the combined amount shall not exceed the limits of this policy for any loss under Coverage A, Hull and Equipment or Coverage E, Boat Trailer.

(Doc. No. 34-5 at 13.)

The insurers both maintain that GNIC's policy is clear and unambiguous, (Doc. Nos. 30 at 8-14, 33 at 16-23), but reach opposite conclusions on (1) their interpretation of the policy and (2) allocation of coverage. GEICO claims that, because the PWC used in the incident was a "vehicle," GNIC's "Vehicles and Uninsured/Underinsured Motorists" "other insurance" *pro rata* clause ("Vehicles Clause") is triggered.[3] (Doc. No. 30 at 7.) As GNIC's *pro rata* Vehicles Clause would apply simultaneously with the excess GEICO Clause, GEICO asserts that in regards to allocation of coverage, GNIC must act as primary insurance by covering defense and settlement amounts.[4] In contrast, GNIC contends that the Vehicles Clause does not apply to this accident. Instead, GNIC argues that its "Personal and Excess" clause ("Excess Clause") governs the *Weiss* case, and that its only responsibility under this clause would be to share equally with

---

[3] In this regard, GEICO argues that GNIC's 'Duplicate coverages' provision, where "if a loss is covered under more than one part of this policy, we will pay you under the part giving you the most coverage, but not under more than one part," directs GNIC to give effect to the Vehicles Clause and respond as primary coverage. (Doc. No. 44 at 20.)
[4] Under the New York rule, which "conforms to the majority rule throughout the nation," where concurrently applicable *pro rata* and excess "other insurance" clauses are triggered "the excess clause is given effect, meaning that the coverage under the policy containing the excess clause does not come into play, and the carrier's duty to defend is not triggered, until the coverage under the policy containing the *pro rata* clause has been exhausted." *Sport Rock Int'l, Inc.*, 65 A.D.3d at 18–19.

3

GEICO in defense costs and expenses, and settlement amounts.[5] (Doc. No. 40 at 5-6.) GEICO replies that even if GNIC's Excess Clause were to apply, the policies' excess clauses would cancel each other out, and both insurance companies would be responsible for coverage *pro rata*, in proportion to the insurers' policy coverage limits.[6] (Doc. No. 44 at 24-30.)

### III. DISCUSSION

A.     **There are no material facts in dispute.**

Rule 56 of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment if it determines that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Filing cross-motions for summary judgment does not disrupt the standard of review. "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)). Where parties cross-move for summary judgment, "a court need not enter judgment for either party." (*Id.*) (citing *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993)).

Pursuant to Local Civil Rule 56.1, the parties submitted statements of undisputed facts, (Doc. Nos. 31, 36), and counterstatements, (Doc. Nos. 42, 45). The matter is ripe for summary

---

[5] GNIC asserts that, where concurrently applicable excess clauses apply, the equal shares method is used to allocate coverage obligations. GNIC relies on New Jersey and Pennsylvania law where "equity requires an equal apportionment of the amount of the settlement and expenses," (*Cosmopolitan Mut. Ins. Co. v. Cont'l Cas. Co.*, 28 N.J. 564, 562 (1959)) "with each insurer matching dollar for dollar payments up to the limits of the lower policy, and with any remaining portion of the loss being paid from the larger policy up to its limits" (*Am. Cas. Co. of Reading, Pa. v. PHICO Ins. Co.*, 549 Pa. 682, 686–93 (1997)).

[6] GEICO maintains that under New York law, "where each policy contains an excess 'other insurance' clause [...] the clauses are deemed to cancel each other out, and the insurers are required to cover the loss on a *pro rata* basis" in proportion to their policy limits. (Doc. No. 44 at 24-25) (quoting *Sport Rock Int'l, Inc.*, 65 A.D.3d at 19.)

4

judgment because the parties allege no disputes of material facts.[7] (Doc. Nos. 30 at 7, 40 at 13.)

B.   **GNIC's policy is ambiguous as it relates to the meaning of the word "vehicle."**

The resolution of these motions depends on the breadth and scope of the word "vehicle" as referenced in GNIC's policy. GEICO and GNIC have failed to show how GNIC's policy is unambiguous, which makes this case unsuitable for summary judgment.

GNIC argues that a "vehicle" is an object other than a PWC, (Doc. No. 33 at 22), and likely refers to an automobile, (*Id.* at 19-20). Because Schlanger never purchased "vehicle" coverage, and the incident involved a PWC, GNIC maintains that the Vehicles Clause is not applicable. (*Id.*) GNIC further argues that because the Excess Clause applies, the Court must base allocation on the concurrently applicable excess "other insurance" clauses.

GEICO argues simply that a PWC is "vehicle" and therefore the Vehicle Clause applies. (Doc. No. 30 at 8.)

1.   **New York's rules of contract interpretation apply.**

Federal courts exercising diversity jurisdiction apply the choice-of-law rules of the forum state. *Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004); *Gilbert v. Seton Hall Univ.*, 332 F.3d 105, 109 (2d Cir. 2003). The Parties agree that New York choice-of-law rules apply. (Doc. Nos. 33 at 12-13, 44 at 27.) New York courts are not required, however, to apply a choice-of-law analysis where there is no conflict between the laws of competing jurisdictions. *Int'l Bus. Machines Corp.*, 363 F.3d at 143. A conflict exists if "the applicable law from each jurisdiction provides different substantive rules." *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998). Where there is no substantive difference, and New York is

---

[7] The Parties dispute costs and expenses for defending Schlanger during the *Weiss* case. GEICO claims defense costs and expenses of $71,921.32, (Doc. No. 31 at 3), while GNIC claims the amount is $69,342.16, (Doc. No. 36 at 9.) This discrepancy, however, is not material to the resolution of the cross-motions for summary judgment.

5

one of the competing jurisdictions, New York courts "are free to apply" New York law. *Int'l Bus. Machines Corp.*, 363 F.3d at 143.

In the present case, the competing jurisdictions are New York, Connecticut, New Jersey, and Pennsylvania. Each state's interest is derived from a different source: Pennsylvania, from the location of GEICO's insured risk—the PWC; Connecticut, from the domicile of GNIC's insured—Schlanger; New Jersey, from the address provided by the PWC owners under GEICO's insurance; and New York, from the location where GNIC's policy was issued.

Under Pennsylvania law, the objective of insurance policy interpretation is to ascertain the most reasonable, probable intention of the parties, while focusing on the reasonable expectations of the insured. *See Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 606 (1999); *Everett Cash Mut. Ins. Co. v. Krawitz*, 430 Pa. Super. 25, 28 (1993); *Galvin v. Occidental Life Ins. Co. of Cal.*, 206 Pa. Super. 61, 64-65 (1965). These intentions derive from the plain language of the document—considered as a whole—reading the policy to avoid ambiguities. *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 606 Pa. 584, 608 (2010); *Tenos v. State Farm Ins. Co.*, 716 A.2d 626, 628–29 (Pa. Super. Ct. 1998). Ambiguities arise when language is "reasonably susceptible of different constructions and capable of being understood in more than one sense." *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 606 (1999) (quoting *Hutchison v. Sunbeam Coal Co.*, 513 Pa. 192, 201 (1986)). If the insurance policy is ambiguous, courts may "look to parol evidence to determine the contract's meaning [but if] unfruitful, the court may then resort to rules of construction." *Penn Twp. v. Aetna Cas. & Sur. Co.*, 719 A.2d 749, 751 (Pa. Super. Ct. 1998) (citation omitted). Where such ambiguities are found, a court may use extrinsic evidence of the purpose of the insurance, its subject matter, the situation of the parties, and the circumstances surrounding the making of the contract, to

reveal the apparent intention of the parties. *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 220 (3d Cir. 2005); *Celley v. Mut. Benefit Health & Acc. Ass'n*, 229 Pa. Super. 475, 482–83 (1974).

Similar rules of insurance policy construction apply in New Jersey, where "courts enforce contracts based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract." *Cypress Point Condo. Ass'n, Inc. v. Adria Towers, L.L.C.*, 226 N.J. 403, 415 (2016) (quoting *Manahawkin Convalescent v. O'Neill*, 217 N.J. 99, 118 (2014)) (internal quotation marks omitted). As such, courts look at the plain language of the policy to determine the meaning of a provision, and when "the language of a contract is plain and capable of legal construction, the language alone must determine the agreement's force and effect." (*Id.*) (quoting *Manahawking*, 217 N.J. at 118) (internal quotation marks omitted). Additionally, "[w]hile specific words may not be ambiguous, the context in which they are used may create an ambiguity. The court's responsibility is to give effect to the whole policy, not just one part of it." (*Id.* at 416) (quoting *Arrow Indus. Carriers, Inc. v. Cont'l Ins. Co. of New Jersey*, 556 A.2d 1310, 1315 (N.J. Super. Ct. Law. Div. 1989)) (internal quotation marks omitted). A policy is ambiguous when it "is subject to more than one reasonable interpretation […] and the 'court may look to extrinsic evidence as an aid to interpretation.'" *Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 224 N.J. 189, 200 (2016) (quoting *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 195 N.J. 231, 238 (2008)).

Connecticut applies similar rules of interpretation to insurance policies, following the general rules of contract construction. *See Liberty Mut. Ins. Co. v. Lone Star Indus., Inc.*, 290 Conn. 767, 795–96 (2009). The controlling query remains the "intent of the parties, that is, the coverage that the insured expected to receive coupled with the coverage that the insurer expected

to provide, as expressed by the language of the entire policy." (*Id.*) (quoting *Wentland v. American Equity Ins. Co.*, 267 Conn. 592, 600–01 (2004)) (internal quotation marks omitted). When policy provisions are clear and unambiguous, the intention of the parties is deduced from the "natural and ordinary meaning" of the terms. (*Id.*) Courts will evaluate the policy as a whole, and "consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result," but an ambiguity arises if a provision "is reasonably susceptible to more than one reading." *Lexington Ins. Co. v. Lexington Healthcare Grp., Inc.*, 311 Conn. 29, 38 (2014) (quoting *Johnson v. Connecticut Ins. Guaranty Assn.*, 302 Conn. 639, 643 (2011)) (internal quotations omitted). Extrinsic evidence may be "admissible if relevant 'to explain an ambiguity appearing in the instrument.'" *TIE Commc'ns, Inc. v. Kopp*, 218 Conn. 281, 288–89 (1991) (quoting *Jay Realty, Inc. v. Ahearn Development Corporation*, 189 Conn. 52, 55–56 (1983)).

New York follows general rules of contract construction when interpreting insurance policies. *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 98–99 (2d Cir. 2012). Insurance policies are interpreted as to "give effect to the intent of the parties as expressed in the clear language of the contract." *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (quoting *Vill. of Sylvan Beach, N.Y. v. Travelers Indem. Co.*, 55 F.3d 114, 115 (2d Cir. 1995)) (internal quotation marks omitted). The parties' intentions are derived by reading the policy as a whole, giving words and phrases "their plain meaning" and interpreting the policy "so as to give full meaning and effect to all of its provisions." *Olin Corp.*, 704 F.3d at 99 (quoting *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005)) (internal quotation marks omitted). In other words, the policy must "be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will

8

be so interpreted as to give effect to its general purpose' [because the] meaning of a writing may be distorted where undue force is given to single words or phrases." *Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358 (2003) (quoting *Empire Props. Corp. v. Manufacturers Trust Co.*, 288 N.Y. 242, 248 (1942), 3 Williston, Contracts §618) (internal quotation marks omitted). Moreover, "[w]herever possible, operation, effect and meaning must be given to every sentence, clause and word of an insurance policy, with reasonable effort made to harmonize and give effect to all parts of the contract." *Facet Indus., Inc. v. Wright*, 95 A.D.2d 262, 265 (N.Y. App. Div. 1983), *rev'd on other grounds,* 465 N.E.2d 1252 (1984) (citation omitted). In interpreting the policy, the plain language "is construed 'in light of 'common speech' and the reasonable expectations of a businessperson.'" *U.S. Fid. & Guar. Co. v. Fendi Adele S.R.L.*, 823 F.3d 146, 150 (2d Cir. 2016) (quoting *Ace Wire & Cable Co. v. Aetna Cas. & Sur. Co.*, 60 N.Y.2d 390, 398 (1983). Courts in New York State usually invoke dictionary definitions to determine the "plain and ordinary meaning" of words found in a contract. *10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 120 (2d Cir. 2011) (quoting *Mazzola v. Cnty. of Suffolk*, 143 A.D.2d 734, 735 (N.Y. App. Div. 1988)). *See also Lend Lease (U.S.) Const. LMB Inc. v. Zurich Am. Ins. Co.*, 136 A.D.3d 52, 56 (N.Y. App. Div. 2015). Any interpretation of a contract that "has the effect of rendering at least one clause superfluous or meaningless [...] is not preferred and will be avoided if possible." *Olin Corp.*, 704 F.3d at 99 (quoting *LaSalle Bank Nat'l Ass'n*, 424 F.3d at 206). The question of ambiguity lies on "whether there is a 'reasonable basis for a difference of opinion as to the meaning of the policy.'" *U.S. Fid. & Guar. Co.*, 823 F.3d at 150 (quoting *Fed. Ins. Co. v. Int'l Bus. Machines Corp.*, 18 N.Y.3d 642, 646 (2012)). When the court identifies ambiguities, it may use extrinsic evidence to "ascertain the parties' intent at the formation of the contract." *Olin Corp.*, 704 F.3d at 99 (citing *JA Apparel Corp. v.*

9

*Abboud*, 568 F.3d 390, 397 (2d Cir.2009)). If ambiguity remains after the use of extrinsic evidence, other rules of contract interpretation may be applied. (*Id.*)

Based on this Court's analysis, each competing jurisdiction follows similar rules of contract interpretation—there is no conflict, or substantive difference, between their laws. The Parties also agree that no such conflict exists. (Doc. Nos. 33 at 13, 44 at 11.) For this reason, the Court will apply New York law to interpret GNIC's Masterpiece Policy.

### 2. GNIC's insurance policy is ambiguous as it relates to the meaning of "vehicle."

Ambiguity exists in the meaning of the word "vehicle" as applied to the Masterpiece Policy. GNIC argues that Schlanger "has never identified any issue with or misunderstanding of the language set forth" in the policy, and that because he "has not claimed any ambiguity in the policy language at issue [...] no ambiguity analysis is required." (Doc. No. 40 at 21-22.) However, Schlanger's lack of assertions of confusion do not equate to his potential lack of understanding of this policy. Moreover, this is an erroneous reading of the law. New York's contract construction rules do not consider the subjective understanding of the parties, but rather the intention of the parties as expressed by the clear language of the policy. *See Parks Real Estate Purchasing Grp.*, 472 F.3d at 42.

In determining the use of the word in common speech, the dictionary definitions provide a roadmap, but leave much to interpretation. As defined by Merriam-Webster, a vehicle is "a means of carrying or transporting something [e.g.,] planes, trains, and other vehicles [e.g., a] motor vehicle." Vehicle, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/vehicle, (last visited March 31, 2017). This definition encompasses transportation by air, land, and water, and would include the PWC in question. This assessment would be supported by definitions of the word "jet ski," which include, "[a] small, jet-propelled

10

*vehicle* that skims across the surface of water and typically is ridden like a motorcycle." Jet ski, *English Oxford Living Dictionary*, https://en.oxforddictionaries.com/definition/us/jet_ski, (last visited March 31, 2017) (emphasis added). Yet, as defined by the English Oxford Living Dictionary, a "vehicle" is "[a] thing used for transporting people or goods, *especially on land*, such as a car, truck, or cart." Vehicle, *English Oxford Living Dictionary*, https://en.oxforddictionaries.com/definition/us/vehicle, (last visited March 31, 2017) (emphasis added). This definition is bound to connotations, in that its reasonable interpretation may lead a user or listener to believe a "vehicle" to be a land mode of transportation. As such, where common speech uses this latter definition, the exclusion of a "jet ski" is a reasonable possibility. In that same sense, a "jet ski" may not even be defined in terms of "vehicle," but rather as "a small motorized usually recreational *watercraft*."[8] Jet Ski, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/jetski, (last visited March 31, 2017) (emphasis added). These dictionary definitions facilitate a "reasonable basis for differences of opinion" when interpreting GNIC's policy. With two general approaches, there is uncertainty as to the meaning ascribed to these words in GNIC's Vehicles Clause.

The definitions that apply to the whole contract, provided in the policy's "Introduction," do not define the words "vehicle" or "jet ski." (Doc. No. 35-1 at 14.) Moreover, these terms are not defined under the "Policy Terms"—the section in the policy where the Vehicle Clause is located. Nonetheless, other sections of the policy do offer particular definitions of the word "vehicle." For instance, in the policy's "Personal Liability Coverage," a "'registered vehicle' means any motorized land vehicle not described in 'unregistered vehicle,'" where "unregistered

---

[8] "Watercraft" is defined as "[a] boat or other vessel that travels on water" (Watercraft, *English Oxford Living Dictionaries*, https://en.oxforddictionaries.com/definition/watercraft, (last visited March 31, 2017)); or a "ship, boat" (Watercraft, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/watercraft, (last visited March 31, 2017)).

11

vehicle" contains various categories of excluded "motorized land vehicles." (Doc. No. 35-3 at 3.) And under the policy's "Family Protection Coverage" for carjacking, a "'[c]overed vehicle' means any private passenger vehicle, motorcycle or motor home you or a family member owns, rents or has furnished for regular use." (Doc. No. 35-2 at 11.) In these instances, GNIC's use of the word "vehicle" narrows the term to objects traveling by land. This definition is further emphasized by the policy's use of the term "private passenger vehicle" under the previously cited "Family Protection Coverage." Although vague in a vacuum, the term "private passenger vehicle" takes on new meaning when considering that this part of the policy provides "Family Protection Coverage" for "carjacking." It would be puzzling to derive, or include, any other meaning (e.g., jet ski), especially when interpreting these words "with reference to the whole," and without giving "undue force [to] single words or phrases." The term "private passenger vehicle" under the "covered vehicle" definition is similarly used. In that clause, the word "vehicle" may be regarded as a "land vehicle" when considering its use in the "Family Protection Coverage" for a "road" rage occurrence. (Doc. No. 35-2 at 15.)

On occasion, the policy differentiates between modes of transportation, specifically between vehicles and watercraft. Such distinctions relieve potential ambiguities, and suggest that the policy uses the term "vehicle" for a "land vehicle." For instance, the policy covers "collision of [a] watercraft with a land vehicle," (Doc. No. 35-1 at 24); coverage is extended "regardless of how many claims, homes, vehicles, watercraft or people are involved in the occurrence," (Doc. No. 35-3 at 2); and a covered person means "any person using a vehicle or watercraft" (*Id.*)

The Masterpiece Policy, however, contains other provisions that, with their use of the word "vehicle," are susceptible to two reasonable interpretations. The policy's coverage for

12

"home and vehicle modification expenses" provides an example. In that provision, coverage is extended "if [insured] suffers a permanent injury" caused by a "carjacking, hijacking, child abduction, home invasion, air rage or road rage occurrence for the necessary costs to improve accessibility and use of your residence premise(s) or your vehicle(s) or those of a family member." (Doc. No. 35-2 at 16-17.) Reading the meaning of "vehicle" under this provision merely as a "land vehicle," as a way to harmonize the previously noted meanings and give effect to all parts of the contract, limits the protections that may be reasonable under this clause. In that sense, "vehicle modification" would be limited to "land vehicles," baffling the reasonable reader who interpreted the clause to include their boat, aircraft, or other kind of vehicle.

Two other examples evidence the ambiguities found in GNIC's policy. Under the "Family Protection Coverage," the policy excludes "vehicles used for a fee," where GNIC does not cover "loss arising out of the ownership or operation of a vehicle while it is being used to carry people or property for a fee. This exclusion does not apply to a shared-expenses car pool…" (Doc. No. 35-2 at 19.) A similar use of the term "vehicle" appears in the "Rented or borrowed vehicles" provision of Schlanger's "Personal Liability Coverage." (Doc. No. 35-3 at 9.) This section provides coverage for damages caused by the use of a rented or borrowed vehicle. (Doc. No. 35-3 at 9.) However, as stated in the final part of the provision, coverage excludes "a private passenger vehicle, a pickup truck, panel truck or a van" owned by the insured. (*Id.*) The "rented or borrowed vehicles" clause may be marked as unambiguous because, within the clause, there are few examples of land vehicles not covered under the policy (excluding pickup trucks, panel trucks or vans). However, these exclusions are a floor and not a ceiling, in that what is *included* in the coverage is not capped by the "rented or borrowed vehicles" provision. Under these open-ended, ample terms, there is no reason why coverage

cannot be extended to a host of snow, air, water vehicles—or in this case, a jet ski. The same logic applies to the "vehicles used for a fee" clause.

As these examples illustrate, there are reasonable bases for a difference of opinion as to the meaning of the word "vehicle" under GNIC's policy. The Vehicles Clause presents similar ambiguities. Under its title, "Vehicles and Uninsured/Underinsured Motorists," (Doc. No. 35-3 at 19), the word "motorists"[9] may qualify the meaning of the word "vehicle" under the clause to mean "automobile" or "land vehicle." This definition of "vehicle" finds support as the clause only excepts "*non-owned* motorized land vehicles" (emphasis added) from *pro rata* coverage. There is also a different reasonable interpretation of this clause. The existence of the word "motorists" in the title may be merely complementary—an addition that includes coverage for uninsured/underinsured car drivers ("motorists"), as well as ("and") vehicles in general. Thus, with otherwise open-ended language, the rest of the clause can be read to act as a general coverage for the broad definition of "vehicle," one that includes, but is not limited by, "motorized land vehicles." Therefore, under this policy, the Vehicles Clause can be interpreted as both affirming and denying *pro rata* coverage for the PWC.

An apparently critical fact for GNIC is that Schlanger did not purchase "vehicle" coverage with this policy, which GNIC argues makes the Vehicle Clause inapplicable. (Doc. No. 33 at 20.) According to the charts provided under the "Premium Summary," and the "Coverage Summary," Schlanger had coverage for: Home and Contents, Valuable Articles, and Family Protection, and Liability. (Doc. Nos. 35-1 at 5, 10-11.) There is no question from reviewing the policy that Schlanger did not have "vehicle coverage." The "Vehicle premium" clause is remarkable in this regard. (Doc. No. 35-3 at 18.) The clause is included within the

---

[9] Motorist is defined as "[t]he driver of a car." Motorist, *English Oxford Living Dictionaries*, https://en.oxforddictionaries.com/definition/motorist, (last visited March 31, 3017).

"Policy Terms" "General Conditions," and provides conditions that may alter an insured's "vehicle" premium. (*Id.*) The language dictates that "[i]f you have vehicle coverage, the premium for the vehicle coverage is based on information we have received from you, your agent, or other sources." (*Id.*) As stated, the clause does not assume the existence of vehicle coverage. On the contrary, the clause assumes that vehicle coverage is necessary for the conditions on premium to apply. This would suggest that this clause only applies when an insured purchased "vehicle coverage."

The main quandary for the Court is to divine the meaning of "vehicle" from common speech, plain meaning, and by giving effect to, and harmonizing, all clauses in this policy. If the "Vehicle premium" clause is not applicable unless a premium is paid, it would be logical to assume that there is no coverage for any vehicle mentioned under the whole policy. Thus, for instance, the "vehicles used for a fee" or the "home and vehicle modification expenses" clauses would be rendered meaningless. This, of course, must be avoided. Seldom does GNIC, in its memorandums, or even in its Masterpiece Policy, use the term "automobile" to suggest a "vehicle."[10] Nevertheless, it may be the case that under the "Vehicle premium" clause, "vehicle" means "automobile"—a reasonable interpretation because, as per the policy, Schlanger had no "vehicle coverage." Under this rationale, the Court will make an effort to harmonize and give effect to all the contract's provisions by using "automobile" as the meaning of "vehicle." However, as a balance scale, adding definitions to some provisions renders other provisions meaningless, and vice versa. In this case, finding the word "vehicle" in the "Vehicle premium" clause to mean an "automobile" does not make the "vehicles used for a fee" or "home and vehicle modification expenses" provisions any clearer. The broad, and open-ended terms in

---

[10] GNIC uses the word "automobile" in sections that are not part of the policy. As stated in the "Premium Summary," the policy only includes the "Coverage Summary and policy provisions..." (Doc. No. 35-1 at 5.)

15

those clauses negate any reason to make coverage available only to automobiles, and not to snow, air, water, or even other land vehicles.

Overall, what results from reviewing this policy, through the various clauses and definitions, is a circular loop of confusion of meaning. For that reason, the language found in GNIC's policy is reasonably susceptible to a difference of opinion, and is therefore ambiguous.

## IV. CONCLUSION

For the foregoing reasons, I recommend that the Court **DENY** each Party's motions for summary judgment.

Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days only when service is made under Fed. R. Civ. P. 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to by the parties)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the Chambers of the Honorable Gregory H. Woods, 500 Pearl Street, Room 2260, New York, NY 10007, and to the Chambers of the undersigned, 500 Pearl Street, Room 1970, New York, NY 10007. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(d).

DATED: September 11, 2017
New York, New York

                                        Respectfully Submitted,

                                        */s/ Ronald L. Ellis*

                                        The Honorable Ronald L. Ellis
                                        United States Magistrate Judge